**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LETICIA JIMENEZ,<br><br>            Plaintiff,<br><br>    v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of the<br>Social Security Administration,<br><br>            Defendant. | No. CV 13-8676 SS<br><br><br>**MEMORANDUM DECISION AND ORDER** |

**I.**

**INTRODUCTION**

   Leticia Jimenez ("Plaintiff") seeks review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner" or the "Agency") denying her Disability Insurance Benefits and Supplemental Security Income. The parties consented, pursuant to 28 U.S.C. § 636(c), to the

1 | jurisdiction of the undersigned United States Magistrate Judge.
2 | For the reasons stated below, the decision of the Commissioner is
3 | AFFIRMED.

4

5 | **II.**

6 | **PROCEDURAL HISTORY**

7

8 | Plaintiff filed applications for Title II Disability
9 | Insurance Benefits ("DIB") and Title XVI Supplemental Security
10 | Income ("SSI") on July 27, 2010. (Administrative Record ("AR")
11 | 233-36, 237-41). Plaintiff alleged a disability onset date of
12 | September 20, 2007. (AR 233, 237). The Agency denied
13 | Plaintiff's applications on March 8, 2011. (AR 105-07, 108-10).
14 | On March 24, 2011, Plaintiff requested a hearing before an
15 | Administrative Law Judge ("ALJ"). (AR 111-12). Plaintiff
16 | testified at the first of two hearings before ALJ Christine Long
17 | on May 3, 2012 ("First Hearing"). (AR 49-68). A Spanish
18 | language interpreter translated for Plaintiff. (AR 52).

19

20 | At the First Hearing, vocational expert ("VE") Susan D.
21 | Green incorrectly cited the Dictionary of Occupational Titles
22 | ("DOT") code for Plaintiff's previous relevant employment as a
23 | data entry clerk. (AR 72). After the hearing, the ALJ conducted
24 | additional research to establish the proper DOT code. (AR 72).
25 | On May 23, 2012, the ALJ sought a written opinion by a new VE,
26 | Frank Corso, Jr., as to whether use of the wrong DOT code could
27 | lead to an incorrect assessment of Plaintiff's residual
28 | functional capacity (RFC). (AR 335-39). Mr. Corso proferred his

2

1   opinion on May 30, 2012.  (AR 339).  On June 5, 2012, the ALJ

2   informed Plaintiff that she wished to enter Mr. Corso's opinion

3   into the record as additional evidence.  (AR 342).

4

5       On June 14, 2012, Plaintiff, now represented by attorney

6   Joel D. Leidner, requested a supplemental hearing.  (AR 161).  On

7   July 18, 2012, Plaintiff testified at the supplemental hearing

8   ("Second Hearing").  (AR 69-96).  The ALJ issued an unfavorable

9   decision on August 21, 2012.  (AR 22-38).  Plaintiff filed a

10  timely request for review with the Appeals Council on September

11  20, 2012 (AR 18), which the Council denied on October 22, 2013.

12  (AR 1-4).  Plaintiff filed the instant action on December 3,

13  2013.  (Dkt. No. 3).

14

15                              **III.**

16                     **FACTUAL BACKGROUND**

17

18      Plaintiff was born on October 18, 1965.  (AR 36).  She was

19  forty-one years old as of the alleged disability onset date and

20  forty-six years old when she appeared before the ALJ.  (AR 57,

21  75, 233, 237).  Plaintiff attended elementary school in Mexico

22  and continued her education through the tenth grade after moving

23  to the United States in 1978.  (AR 36, 58).  Plaintiff worked as

24  a check processor for a bank for approximately ten years prior to

25  the alleged disability onset date.  (AR 260).  She alleges that

26  \\

27  \\

28  \\

1  pain in her hands prevented her from working after September 20,
2  2007.[1]  (AR 76).

3

4      On September 27, 2007, Plaintiff filed claims with the
5  California Workers' Compensation Appeals Board ("Board") for four
6  work-related injuries and conditions sustained between 2002 and
7  2007: "strain and stress on the job," "[Plaintiff] fell from a
8  chair," "a metal hit [Plaintiff's] chest" and "strain of viewing
9  computer monitor."  (AR 203-07).  Board-approved workers'
10  compensation physician Michael Bazel treated Plaintiff beginning
11  on September 27, 2007.  (AR 386).  Although the Board initially
12  found Plaintiff ineligible for benefits, an ALJ reversed this
13  decision on appeal.  (AR 214).  The Board ALJ noted that
14  Plaintiff had experienced hand pain since 2004, but a Board-
15  appointed orthopedic surgeon failed to consider this symptom when
16  he certified Plaintiff to return to work in February 2008.[2]
17  (Id.).  Plaintiff settled with the Board on July 7, 2009.[3]  (AR
18  217).

19  \\

20
_____

21  [1]  Plaintiff told the ALJ that she stopped working due to hand
    pain.  (AR 76).  However, in the Disability Report accompanying
22  her benefits application, Plaintiff stated that she stopped
    working because of "conditions" including "Lower back," "Right
23  and Left Wrists," "Carpal Tunnel," "Arthritis in Knees and body,"
    "Insomnia" and "Depression and Anxiety."  (AR 259).
24  [2]  The Board ALJ's observation is confirmed by records from
    Plaintiff's personal physician, Dr. George Bernales, which noted
25  wrist pain as early as 2003.  (See, e.g. AR 443).
26  [3]  As part of her workers' compensation settlement, Plaintiff
    declared that she was not receiving Social Security benefits and
27  did not anticipate applying for benefits within six months.  (AR
    231).  She did not apply for Social Security benefits until a
28  year after the settlement.  (AR 233, 237).

4

**A.    Medical History And Doctors' Opinions**

    **1.    Physical Condition**

        a.    Dr. George Bernales

Plaintiff first saw George Bernales, M.D., her primary care physician, in 1994. (AR 496). Dr. Bernales treated Plaintiff for insomnia (January 12, 2000; AR 482); a ganglion cyst (June 21, 2000; AR 480); anxiety (June 20, 2001; AR 478); and a non-cancerous growth in Plaintiff's right eye.[4] (AR 427-28). On August 25, 2003, Dr. Bernales referred Plaintiff to rheumatologist Michael Maehara, M.D., for left wrist pain. (AR 443). The rheumatologist's treatment notes show that Plaintiff reported suffering intermittent wrist pain for a year. (Id.). He attributed the pain "most likely [to] overuse syndrome" and prescribed Motrin, also reporting his conclusions to Dr. Bernales. (AR 444). Dr. Bernales diagnosed carpal tunnel syndrome ("CTS") in April 2005.[5] (AR 429).

\\

\\

\\

\\

---

[4]    The specific eye diagnosis was of a pterygium. (AR 428). A pterygium is a non-cancerous growth that may be symptomless or cause burning, irritation or vision problems. See Pterygium, MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/ency/article/001011. htm (last visited Oct. 9, 2014).

[5]    The exact date is unclear from the treatment note, as is the wrist in question.

5

1              b.   Dr. Michael Bazel

2

3      On September 25, 2007, Plaintiff selected Michael Bazel,

4 M.D., to serve as the primary treating physician for her workers'

5 compensation determination.   (AR 202, 386).   Plaintiff first

6 visited Dr. Bazel that same day.  (AR 386).  On February 9, 2009,

7 two months after his last examination of Plaintiff, Dr. Bazel

8 issued his final "Permanent and Stationary Report" to the Board.

9 (Id.).   After describing the injuries Plaintiff alleged in her

10 workers' compensation claims (AR 387-89), Dr. Bazel noted that

11 Plaintiff complained of headache, "bilateral wrist and hand,"

12 upper back pain, and low back pain.[6]  (AR 389).  He performed a

13 number of tests on Plaintiff's upper extremities, noting

14 tenderness "over the dorsal and palmar aspects of the lists,

15 bilaterally."  (AR 392).  Both wrists showed a normal range of

16 motion.   (Id.).  However, two tests used to diagnose CTS -- the

17 Tinel and Phalen tests -- showed results consistent with the

18 syndrome.[7]                                                \\

19 \\

20 \\

21 [6]    The Court assumes that "bilateral wrist and hand" also
22 refers to a pain complaint.
   [7]    "In the Tinel test, the doctor taps on or presses on the
23 median nerve in the patient's wrist. The test is positive when
   tingling in the fingers or a resultant shock-like sensation
24 occurs. The Phalen, or wrist-flexion, test involves having the
   patient hold his or her forearms upright by pointing the fingers
25 down and pressing the backs of the hands together. The presence
   of carpal tunnel syndrome is suggested if one or more symptoms,
26 such as tingling or increasing numbness, is felt in the fingers
   within 1 minute."  Carpal Tunnel Syndrome Fact Sheet, NINDS,
27 http://www.ninds.nih.gov/disorders/carpal_tunnel/detail_carpal_tu
   nnel.htm (last visited Oct. 9, 2014).
28
                                6

Dr. Bazel also reviewed magnetic resonance images (MRIs) and nerve conduction studies of Plaintiff's wrists taken by radiologist Sim Hoffman, M.D., on December 12, 2007. (AR 399). He affirmed the radiologist's impression that enlargement of the median nerve in Plaintiff's right wrist was consistent with CTS, and also found mild enlargement of the median nerve in the left wrist.[8] (AR 399). However, after comparing the results of upper extremity studies conducted on January 23 and July 31, 2008, Dr. Bazel found "definite improvement" in Plaintiff's CTS and an apparent resolution of left ulnar neuropathy. (AR 399-400). Dr. Bazel also noted "tenderness and spasm" in Plaintiff's lower back (AR 395), and described an MRI showing "multilevel disk disease" and a nerve conduction study "consistent with radiculopathy."[9] (AR 402). Here once again, however, Dr. Bazel's final report noted "definite improvement" in the lumbar area, with "apparent resolution" of neuropathy he had suspected earlier. (AR 399-400).

Dr. Bazel's December 9, 2008 Permanent and Stationary Report made eleven diagnoses: (1) pterygium; (2) vision difficulty; (3)

---

[8]   In his report to Dr. Bazel, Dr. Hoffman opined that carpal tunnel syndrome "cannot be excluded" (AR 348) and "should be clinically considered." (AR 351). Dr. Bazel interpreted Dr. Hoffman's MRIs and nerve conduction studies as showing "findings consistent with bilateral carpal tunnel syndrome." (AR 402). Dr. Hoffman did not compare the extent of the median nerve enlargement in Plaintiff's left and right wrists. (See AR 348, 351).

[9]   Radiculopathy is "any disease that affects the spinal nerve roots," and may be caused by herniated disks. Herniated disk, MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/ency/article/000442.htm (last visited Oct. 10, 2014).

1  lower back strain; (4) disc disease; (5) radiculopathy; (6)

2  bilateral wrist sprain; (7) bilateral CTS; (8) headaches; (9)

3  depression; (10) anxiety; and (11) insomnia.[10]   (AR 401).

4  However, Dr. Bazel's 2008 report found that Plaintiff had

5  "dramatically improved" and could return to work with certain

6  restrictions.[11]   (Id.).   These included avoiding repetitive

7  pushing or pulling with the hand or wrist, avoiding repetitive

8  finger or wrist motion, not lifting "beyond 20 lbs.," and

9  avoiding bending, stooping, climbing, prolonged standing or

10  walking, and driving over 60 minutes. (AR 402).

11

12        c.   Dr. Carl E. Millner

13

14     On January 21, 2011, state agency consultative physician

15  Carl E. Millner, M.D., conducted an internal medicine examination

16  of Plaintiff. (AR 506-10).   Plaintiff complained of wrist and

17  knee pain, and Dr. Millner ordered x-rays of Plaintiff's wrists

18  and knees. (AR 506, 511-12).   The x-rays revealed soft-tissue

19  swelling over all of these joints, but no acute conditions. (AR

20  511-12).   Plaintiff reported that she was currently taking

21  lorazepam, ranitidine, cyclobenzaprine, and Tylenol Arthritis.[12]

22  _____

23  [10]   Dr. Bazel noted that the pterygium had "resolved." (AR
   400).   Plaintiff appears to have undergone surgery to remove this
   condition in 2006. (AR 426).

24  [11]   Dr. Bazel certified Plaintiff to return to work as early as

25  October 23, 2008, so long as she restricted the use of her hands.
   (AR 406).

26  [12]   According to the National Institutes of Health, the first
   three medications are used for the following conditions:

27  lorazepam (anxiety, insomnia); ranitidine (acid reflux);
   cyclobenzaprine (muscle pain and strain). Lorazepam, Ranitidine,

28  Cyclobenzaprine, MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/

1   Dr. Millner noted that Plaintiff's CTS had "resolved" following
2   conservative treatment.   (AR 507, 509).   He recorded normal
3   responses to both the Phalen and Tinel tests used for this
4   condition.[13]   (AR 509).   Dr. Millner noted that at Plaintiff's
5   wrist joints, "[f]lexion, extension, radial deviation and ulnar
6   deviation are within normal limits bilaterally."   (AR 508).
7   Flexion and extension of Plaintiff's finger and thumb joints were
8   normal, as well.   (Id.).   She was able to make a fist "without
9   difficulty,"  to  extend  her  hands,  and  "to
10  oppose the thumb to each finger."   (Id.).   Although Dr. Millner
11  diagnosed mild osteoarthritis of the knees and mild lumbar
12  radiculopathy, based on his examination and a review of
13  Plaintiff's history he found that Plaintiff had "no restrictions"
14  on pushing, pulling, lifting, carrying, walking, standing,
15  sitting or any other physical activity.   (AR 509-10).

17      **2.   Mental Condition**

19          a.   Dr. Alexis Meshi

21      On February 15, 2011, state agency consultative psychiatrist
22  Alexis Meshi, M.D., conducted a mental health examination of
23  Plaintiff.   Dr. Meshi noted that Plaintiff drove herself to the
24  examination but wore a brace on her right hand.   (AR 515).
25  Plaintiff reported that she had been struggling with moderate

---

27  druginfo/meds/ (locate "Browse by generic or brand name" and
    click first letter of drug name) (last visited Oct. 10, 2014)).
28  [13]    See n.7 for descriptions of these tests.

depression and some anxiety issues since 2007. (<u>Id.</u>). She cried "more frequently," suffered insomnia, and reported having "what sounds like panic attacks." (<u>Id.</u>). However, medications relieved these symptoms. (AR 515-516). Plaintiff said she had "[gotten] along excellently" while working at the bank and had not been the subject of any "negative personnel action." (AR 516). She denied a family mental illness history and was not seeing a psychiatrist. (<u>Id.</u>).

Dr. Meshi assessed Plaintiff with mild memory problems and "more significant difficulty with attention and focus issues." (AR 518). However, she opined that Plaintiff could follow one- and two-part instructions "certainly with treatment she is currently not doing." (<u>Id.</u>). Similarly, she noted that Plaintiff had symptoms of depression and anxiety that could be significantly relieved with appropriate treatment. (<u>Id.</u>). She recommended that Plaintiff discuss further treatment with her physician, and judged Plaintiff's prognosis as "fair." (<u>Id.</u>).

**B.**   **<u>Non-Examining Physicians' Opinions Regarding Plaintiff's Physical And Mental Condition</u>**

1.   Dr. Samantha Park

Nonexamining physician Samantha Park, M.D., reviewed Plaintiff's medical records on March 4, 2011. (AR 97-104). Dr. Park took into account Plaintiff's allegations of low back pain, CTS, arthritis, insomnia, depression and anxiety. (AR 97). She

noted that Plaintiff had "sharp pains" in her wrists and knees and had headaches. (Id.)  Dr. Park noted the medications Plaintiff reported taking, her alleged physical limitations and her daily activities. (Id.).  Dr. Park also summarized Plaintiff's medical records. (AR 98, 100, 102).  Based on this review, Dr. Park filed a Disability Determination showing a primary diagnosis of depression and a secondary diagnosis of mild osteoporosis.[14]  (AR 103-04).

### 2.   Dr. Winston Brown

Dr. Winston Brown reviewed Plaintiff's records and created a Mental RFC Assessment on March 4, 2011. (AR 521-37).  Dr. Brown concluded that Plaintiff's RFC included both affective and anxiety-related disorders. (AR 525).  He found that Plaintiff exhibited a medically determinable impairment of anxiety that did not precisely satisfy the criteria for a specific anxiety-related disorder. (AR 530).  Dr. Brown opined that Plaintiff was either "not significantly limited" or "moderately limited" across a range of capacities, including understanding and memory, sustained concentration and persistence, social interaction, and ability to adapt. (AR 523).  As an overall mental RFC assessment, Dr. Brown concluded that Plaintiff "is able to perform work where interpersonal contact is incidental to work performed, e.g. assembly work; complexity of tasks is learned and \\

---

[14]   The Disability Determination was also signed by C. Winston Brown, M.D. (AR 103-04).

performed by rote, few variables, little judgment; supervision required is simple, direct and concrete (unskilled)." (Id.).

**C.  Vocational Expert Testimony**

1.  Susan Green

VE Susan Green testified at the First Hearing regarding the existence of jobs that Plaintiff could perform, given her physical and mental limitations. (AR 65-67). Following the First Hearing, however, the ALJ concluded that Ms. Green used an improper DOT code for Plaintiff's past relevant work, causing her to give inaccurate answers to the ALJ's hypotheticals. (AR 28, 72). The ALJ discarded VE Green's assessment and sought an assessment from a new VE, Frank Corso, Jr. (AR 74, 336).

2.  Frank Corso, Jr.

The ALJ posed a single hypothetical in a written inquiry that Mr. Corso answered on May 30, 2012. (AR 335-39). The ALJ asked Mr. Corso to assume a hypothetical individual with Plaintiff's age, education, and literacy skills. The individual previously worked as a Data Entry Clerk "with an exertional level of sedentary work and a skill level . . . of 4." (AR 335, 337). The individual had an RFC to perform light work as follows: "lift and carry 20 pounds occasionally and 10 pounds frequently; unlimited sitting ability; stand and walk 6 hours total in an 8 hour workday and must be able to alternate sitting and standing

every 2 hours with normal breaks; occasional stooping; and frequent handling and fingering with both hands." (AR 337). Mr. Corso opined that such an individual would not be able to perform Plaintiff's past relevant work, because "'Data Entry Clerk' requires constant fingering." (AR 337). However, Mr. Corso concluded that such an individual could perform other occupations. (AR 338). These included work as an order clerk, sorter, "cashier II," sales attendant, charge account clerk, or document preparer." (Id.). Mr. Corso opined that 1,400 to 60,000 such positions existed in the local economy, depending on the specific job, and 40,000 to 1.7 million positions existed in the national economy. (Id.).

     3.   Allan Ey

     Mr. Corso was unable to testify at the Second Hearing, and the ALJ sought new testimony from VE Allan Ey. (AR 73). The ALJ posed three hypotheticals. (AR 83-86). First, she asked the VE to assume an individual of Plaintiff's age and educational background who could lift and carry twenty pounds occasionally and ten pounds frequently. (AR 83-84). The individual could sit for an unlimited time, stand and walk for six out of eight work hours, alternate sitting and standing every two hours with normal breaks, and do frequent handling and fingering with both hands. (Id.). VE Ey opined that such an individual could not do Plaintiff's past work, but could perform such "light" work as cashier II, with 40,000 jobs available regionally and one million \\

1  nationally, or mail clerk, with 6,000 jobs regionally and 100,000
2  nationally. (Id.).

3

4      In her second hypothetical, the ALJ asked Mr. Ey to assume
5  that the individual could lift and carry no more than ten pounds
6  either occasionally or frequently. (Id.). The individual could
7  sit for no more than four out of eight hours but could stand and
8  walk for six out of eight hours. (AR 84-85). The individual
9  could do only "frequent," not constant, handling and fingering
10 with both hands, and would have to briefly alternate standing and
11 sitting each hour. (AR 85). The VE opined that such an
12 individual could not perform Plaintiff's past work, but could
13 work as a food and beverage order clerk or as a document
14 preparer. (Id.). There were significant numbers of these jobs
15 available regionally and nationally. (Id.).

16

17     Finally, the ALJ asked Mr. Ey to consider a third
18 hypothetical individual who could lift and carry no more than ten
19 pounds occasionally or frequently and who could sit no more than
20 four out of eight hours. (AR 86). However, this individual
21 could stand and walk no more than two hours out of every eight,
22 would have to alternate standing and sitting briefly every thirty
23 minutes, could do only occasional stopping, kneeling, crouching
24 and crawling, and could do no more than occasional fingering with
25 both hands. (Id.). The VE opined that such an individual could
26 do neither Plaintiff's former relevant work nor any other job in
27 the regional or national economy. (Id.).
28 \\

14

1    The ALJ invited Plaintiff's counsel to ask additional

2   questions. (Id.). Of relevance here, counsel asked the VE to

3   opine on the relationship of "repetitive" and "frequent"

4   workplace activities, specifically asking "if a person has to do

5   something frequently . . . would they necessarily have to do that

6   repetitively?" (AR 87). The VE responded that "frequent"

7   activities are those occupying one-third to two-thirds of a

8   workday. (AR 87-88). The VE was unable to establish a direct

9   equivalence of the terms "frequent" and "repetitive" but opined

10   that frequent activities might be those that were "intermittent

11   repetitive." (AR 88).

12

13    Counsel also asked the VE to consider an individual with

14   limitations identical to those Dr. Bazel had specified for

15   Plaintiff: "no repetitive pushing or pulling with hand/wrist, no

16   repetitive finger/wrist motion, . . . no lifting beyond 20

17   pounds, no bending, stooping, climbing, prolonged standing or

18   walking, no driving over 60 minutes." (Compare AR 90 and AR

19   402). The VE opined that an individual with those limitations

20   could not do any of the alternative jobs. (AR 91). Finally,

21   referring to Dr. Meshi's psychiatric report, counsel asked the VE

22   to consider an individual with a "moderately significant"

23   attention and focus problem but who could follow one- and two-

24   part instructions. (AR 91, 92-93, 518). The VE opined that such

25   an individual could not do any of the alternative jobs. (AR 92).

26   \\

27   \\

28   \\

**D.   Plaintiff's Testimony**

    **1.   Testimony Before The ALJ**

Plaintiff attributed her condition to two accidents she suffered while working for the bank, resulting in back and wrist injuries.[15]   (AR 61).   Plaintiff saw worker's compensation physicians until 2009, when she was treated by new physicians. (AR 61-62).   She described her ongoing problems as lower back pain, pain and numbness in her knees, neck and wrist pain, and numbness in her fingers.   (AR 62).   She had physical therapy for her back and wrists but avoided recommended back surgery "because I've heard that people have become not able to walk."   (Id.).

In a typical day, Plaintiff awoke at seven a.m., had a light breakfast and then took pain medication.   (AR 63).   She also took pain medication before going to bed at eight p.m., and again in the middle of the night when she typically awoke with pain.   (AR 63-64).   During the day, she did "whatever I'm able to do that's not heavy" around the house and prepared meals, but relied on her husband to help with household tasks she could not handle.   (AR 63, 77).   She could sit for about an hour, but then would feel "burning pain" in her back and had to stand.   (AR 64).   She needed to stand for a few minutes during the Second Hearing.   (AR

---

[15]   As both hearings were before ALJ Christine Long, discussion of Plaintiff's testimony will be combined in a single section.

16

77). She could walk longer than she could sit, and routinely took walks around the block. (AR 64). However, standing caused her to feel tired, and she felt best when lying down. (AR 78).

Plaintiff experienced "awful" back pain the night before the Second Hearing, and stopped at her physician's office for an injection of pain medication prior to meeting with the ALJ. (Id.). She continued to see a physical therapist twice a week for her hands and once a week for her back, but at the time of the Second Hearing she had not seen an orthopedist for two months. (AR 78-79). She wore braces on both wrists "most of the time," including while driving.[16] (AR 76-77). Plaintiff testified that her medications were effective at treating her pain but caused dizziness. (AR 63).

Plaintiff testified that the pain in her hands caused her to leave her bank job. (AR 76). The pain prevented her from meeting production quotas and caused her to take unscheduled breaks. (Id.). Because her pain medication caused dizziness, she was unable to take it during the workday. (AR 79). She noted that Dr. Bazel, the workers' compensation physician, told her to reduce her work hours from eight to no more than four or six. (AR 80).

\\

\\

---

[16] Plaintiff gave conflicting testimony about her ability to drive, first stating that lower back pain prevented her from driving but then stating that she drove "a little." (AR 58, 63).

**2.   Statements From Plaintiff's Benefits Application**

In reports accompanying her benefits application, Plaintiff stated that she stopped working on September 20, 2007, about a year after her conditions caused her to modify her work habits.[17] (AR 259).  Plaintiff listed these conditions as "Lower back," "Right and Left Wrists," "Carpal Tunnel," "A[r]thritis in Knees and body," insomnia, depression and anxiety.  (Id.).  She noted that her work consisted of running checks through a processing machine and inputting information from the checks on a computer. (AR 261).  Twice a day, she had to lift and carry a "tray full of checks" approximately thirty feet, and she frequently lifted twenty pounds.[18]  (AR 280).  On a typical workday, Plaintiff would sit for six hours, walk or stand for one hour, and write, type or handle small objects for seven hours.  (Id.).  Plaintiff did not have to write or complete reports.  (Id.).

Plaintiff described her symptoms as "sharp pains on my wrist, knees, and also headaches," and stated that the pain usually lasted five hours if unmedicated.  (AR 287).  She told the Agency interviewer that she "[had been] taking medications but I no longer take them.   I am only taking [T]ylenol [for]

---

[17]   Plaintiff did not specify how she had modified her work habits.

[18]   Plaintiff's July 27, 2010 Disability Report and her October 27, 2010 Work History Report indicated that she carried different maximum weights.  In the Disability Report, completed by Agency interviewer P. Rangel, Plaintiff indicated that she carried a maximum of ten pounds.  (AR 261).  In the Work History Report, which Plaintiff completed on her own, she reported carrying up to twenty pounds.  (AR 280).

18

arthritis."[19]   (AR 266).   Plaintiff reported experiencing pain every other day, and stated that excessive lifting, kneeling, "heavy duty work," typing and writing caused pain.   (AR 287). She also experienced migraines approximately monthly.   (AR 288). Cold weather, air conditioning and "not having medicine" made her symptoms worse, but wearing warm clothing, drinking hot tea and physical therapy helped.   (Id.).

In a typical day, Plaintiff showered, had breakfast, did "light" housework, went outside to water her plants, and fed her dog and pet birds.   (AR 289).   Plaintiff was able to prepare complete meals daily, but felt pain if she did not keep the cooking "easy."   (AR 291).   She could do the laundry twice a week, wash small amounts of dishes when necessary and make her bed every day.   (Id.).   However, she needed help opening cans and bottles, getting items from shelves, sweeping and mopping, removing weeds and cutting the lawn.   (Id.).

Plaintiff went for walks outside twice a week (AR 289), went grocery shopping once every two weeks for an hour, and could drive on her own.   (AR 292).   She attended church once a week and went to a park twice a week.   (AR 293).   However, due to her conditions she had to give up camping and could not attend social events at night or in cold weather.   (AR 294).   She no longer

---

[19]   Plaintiff's Disability Report, completed by the Agency interviewer, differed from with the "Pain and Other Symptoms" report Plaintiff completed on her own three months later.   On the latter report, Plaintiff listed her current medications as naproxen, omeprazole, temazepam, ranitidine, and lorazepam. (Compare AR 266 and AR 288).

went to the gym, and required her husband's help to walk the dog or clean the bird cage.  (AR 290).  She could not brush her hair as she wanted to, and "sharp pains" interfered with her sleep. (Id.).

Plaintiff could pay attention for an hour, follow written instructions well "after reading them 2-3 times," and get along well with authority figures.  (AR 294-95).  She had never been fired from a job due to an inability to get along with others. (AR 295).  However, she reported that she experienced anxiety when home alone, and rated her stress level as "mid level."[20] (Id.).

## IV.

### THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity and that is expected to result in death or to last for a continuous period of at least twelve months.  Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).  The impairment must render the claimant incapable of performing the work she previously performed and incapable of

[20]   In the Disability Report filed with her 2011 appeal, Plaintiff described her hands as hurting more and her anxiety and insomnia as worse.  (AR 299).  Due to a lack of income, she had to borrow money from relatives in order to pay for pain medication.  (AR 302).  She also reported suffering from depression.  (Id.).

performing any other substantial gainful employment that exists in the national economy.   Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.   20 C.F.R. §§ 404.1520, 416.920. The steps are:

(1) Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

(2) Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3) Does the claimant's impairment meet or equal one of the specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4) Is the claimant capable of performing his past work?  If so, the claimant is found not disabled. If not, proceed to step five.

(5) Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

\\

\\

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520(b)-(g)(1) & 416.920(b)-(g)(1).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five. Bustamante, 262 F.3d at 953-54. Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry. Id. at 954. If, at step four, the claimant meets her burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity ("RFC"), age, education, and work experience. Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1). The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids"). Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001). When a claimant has both exertional (strength-related) and non-exertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert. Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000) (citing Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988)).

\\

\\

\\

**V.**

**THE ALJ'S DECISION**

The ALJ employed the five-step sequential evaluation process and concluded that Plaintiff was not under a disability within the meaning of the Social Security Act from September 20, 2007, through the date of the ALJ's decision on August 21, 2012. (AR 38). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful employment since September 20, 2007. (AR 31). At step two, the ALJ found that Plaintiff had four "severe" impairments: work-related CTS and left lumbar L5 radiculopathy; mild degenerative disc disease of the lumbar spine; and mild degenerative disc disease of the cervical spine (Id.). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 32). The ALJ then found that Plaintiff had the following RFC:

> [Plaintiff] has the residual functional capacity to: lift and carry 20 pounds occasionally and 10 pounds frequently; sit without limitation; stand and walk 6 hours in an 8-hour workday, but she must be able to alternate between sitting and standing briefly every 2 hours with normal breaks; occasionally stoop; and frequently handle and finger with both hands (20 CFR 404.1520(e); 20 CFR 416.920(e)).

(Id.).

In making this finding, the ALJ gave significant weight to Dr. Bazel's conclusions about Plaintiff's CTS.[21] (AR 34-35). She noted, in particular, that while Dr. Hoffman's MRI and nerve conduction studies suggested carpal tunnel syndrome, Dr. Bazel's December 9, 2008 final report found that Plaintiff's condition had shown "definite improvement" during 2008. (AR 34). She also noted Dr. Bazel's opinion that after a full course of conservative treatment, Plaintiff had "dramatically improved and [was] able to go to modified duty." (AR 35).

Further, the ALJ observed that there was no evidence in the Administrative Record suggesting that Plaintiff sought or obtained treatment for CTS between December 2008 and November 2011, when Plaintiff had a single neurological consultation confirming that CTS was still present. (Id.). Although Dr. Bazel had advised Plaintiff to avoid "repetitive" wrist and finger motions, the ALJ concluded that this still permitted Plaintiff to make "frequent" wrist or finger motions. (Id.). Such motions, she observed, were consistent with the RFC. (Id.). Similarly, Dr. Bazel's Permanent and Stationery Report was "consistent with light work activities" and the limitations encompassed by the RFC. (Id.).

\\

\\

---

[21] The ALJ noted that the Administrative Record included treatment records from Plaintiff's primary care physician, Dr. Bernales, but observed that these records did not establish impairment as of the alleged disability onset date. (AR 36). She opined that Dr. Bernales's records from before or after the "2007-2009" period were not relevant to her inquiry. (Id.).

Additionally, the ALJ weighed Plaintiff's testimony as to her symptoms, limitations and daily activities, concluding that Plaintiff's testimony was not completely credible.   (AR 33-34). The ALJ reasoned, in particular, that Plaintiff's decision not to undergo surgery, her "minimal use of medication," and lack of follow-up treatment or limited use of recommended specialists indicated that her pain was less severe than alleged.   (Id.). Moreover, Plaintiff was able to wash dishes, do laundry, cook, clean, feed her puppy, and grasp and pull weeds, all of which suggested that her capabilities were not as limited as she alleged.   (Id.).

At step four, the ALJ determined that Plaintiff was unable to perform any past relevant work as defined by 20 C.F.R. §§ 404.1520(f), 404.1565, 416.920(f) and 416.965.   (AR 36). Finally, at step five the ALJ considered Plaintiff's age, education, work experience, and RFC and concluded that she could perform jobs available in significant numbers in the national economy.   (AR 38).   The ALJ noted that, due to Plaintiff's "additional limitations," she could not be expected to perform the full range of "light work."   (AR 37).   However, considering the VE testimony, the ALJ found that Plaintiff could find employment as an order clerk, clerical sorter, sales attendant or mail clerk.   (AR 37-38).   Therefore, the ALJ concluded that Plaintiff was not disabled under the Agency's rules.   (AR 38).

\\

\\

\\

1

**VI.**

2

**STANDARD OF REVIEW**

3

4        Under 42 U.S.C. § 405(g), a district court may review the

5   Commissioner's decision to deny benefits.   The court may set

6   aside the Commissioner's decision when the ALJ's findings are

7   based on legal error or are not supported by substantial evidence

8   in the record as a whole.   Aukland v. Massanari, 257 F.3d 1033,

9   1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); Smolen

10  v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v.

11  Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

12

13       "Substantial evidence is more than a scintilla, but less

14  than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson

15  v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)).   It is "relevant

16  evidence which a reasonable person might accept as adequate to

17  support a conclusion." Id. (citing Jamerson, 112 F.3d at 1066;

18  Smolen, 80 F.3d at 1279).   To determine whether substantial

19  evidence supports a finding, the court must "'consider the record

20  as a whole, weighing both evidence that supports and evidence

21  that detracts from the [Commissioner's] conclusion.'" Aukland,

22  257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th

23  Cir. 1993)).   If the evidence can reasonably support either

24  affirming or reversing that conclusion, the court may not

25  substitute its judgment for that of the Commissioner. Reddick,

26  157 F.3d at 720-21 (citing Flaten v. Sec'y, 44 F.3d 1453, 1457

27  (9th Cir. 1995)).

28

# VII.

## DISCUSSION

Plaintiff challenges the ALJ's decision on two grounds. First, Plaintiff asserts that because ALJ failed to reject Dr. Bazel's assessment of Plaintiff's physical limitations, that assessment must be credited as true. (Memorandum in Support of Plaintiff's Complaint ("MSPC") at 5). Second, because Dr. Bazel recommended that Plaintiff avoid repetitive use of her hands, Plaintiff contends that the ALJ's hypothetical -- which allegedly omitted any reference to this limitation -- elicited inaccurate testimony from VE Allan Ey. (MSPC at 6-7).

The Court disagrees with both contentions. The record demonstrates that the ALJ credited Dr. Bazel's opinion, gave it great weight, and found it consistent with the RFC she applied. Moreover, the record contradicts Plaintiff's assertion that the ALJ disregarded Dr. Bazel's recommendation against "repetitive" hand motions when she posed her hypotheticals to VE Ey. Accordingly, for the reasons discussed below, the Court finds that the ALJ's decision must be AFFIRMED.

## A.    The ALJ Gave Proper Weight To Dr. Bazel's Opinions

Plaintiff argues that the ALJ discussed but did not reject Dr. Bazel's report, and that Dr. Bazel's assessment of Plaintiff's limitations should therefore be credited as true.

(MSPC at 5).  The Court disagrees.  The ALJ did fully credit Dr. Bazel's report and arrived at a proper outcome.

Social Security regulations require the ALJ to consider all relevant medical evidence when determining whether a claimant is disabled.  20 C.F.R. §§ 404.1520(b), 404.1527(c), 416.927(c). Where the Agency finds the treating physician's opinion of the nature and severity of the claimant's impairments well-supported by accepted medical techniques, and consistent with the other substantive evidence in the record, that opinion is ordinarily controlling.  20 C.F.R. § 404.1527(c)(2); Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007).  See also Garrison, 759 F.3d at 1012 (citing Orn)(even when contradicted, treating or examining physician's opinion is owed deference, and often the "greatest" weight).  An ALJ must give "specific and legitimate" reasons for rejecting the findings of treating or examining physicians. Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).

Nevertheless, the ALJ is also "responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995); see also Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) ("[T]he ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence."). Findings of fact that are supported by substantial evidence are conclusive. 42 U.S.C. § 405(g); see also Kay v. Heckler, 754 F.2d 1545, 1549 (9th Cir. 1985) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not

1   substitute [its] judgment for the ALJ's."); Ryan v. Comm'r, 528

2   F.3d 1194, 1198 (9th Cir. 2008) ("'Where evidence is susceptible

3   to more than one rational interpretation,' the ALJ's decision

4   should be upheld.") (quoting Burch v. Barnhart, 400 F.3d 676, 679

5   (9th Cir. 2005)).   An ALJ need not address every piece of

6   evidence in the record, but only evidence that is significant or

7   probative.  See Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006,

8   1012 (9th Cir. 2006).

9

10      Here, Plaintiff asserts that the ALJ "did not properly

11  reject the residual functional capacity set by [Dr. Bazel]" and

12  the Court should therefore credit Dr. Bazel's report as true.

13  (MSPC at 5).  Plaintiff suggests that the ALJ failed to give due

14  consideration to Dr. Bazel's prescribed hand restrictions, which

15  included "[n]o repetitive pushing or pulling with hand/wrist,

16  [and] no repetitive finger/wrist motion."  (AR 402).  Plaintiff

17  also observes that Dr. Bazel's "After Care Instructions" of

18  October 22, 2008, advised Plaintiff to make only "limited use" of

19  her hands.  (MSPC at 5; AR 557).  Plaintiff cites Benecke v.

20  Barnhart, 379 F.3d 587 (9th Cir. 2004), for the proposition that

21  limitations identified by a treating physician, and not properly

22  rejected by an ALJ, should be credited as true.  Plaintiff

23  alleges that the ALJ's failure to credit Dr. Bazel's report

24  caused her to pose faulty hypotheticals to VE Ey.[22]

25  _____
    [22]  Plaintiff's Complaint focuses on the part of Dr. Bazel's

26  report relating to Plaintiff's hand limitations, but Dr. Bazel
    also opined on Plaintiff's limitations due to her lumbar

27  condition.  (AR 402).  These included "[n]o lifting beyond 20
    lbs., no bending, stooping, climbing, prolonged standing or

28  walking, no driving over 60 minutes."  (Id.).  The ALJ included

The Court is satisfied, however, that the ALJ did appropriately credit Dr. Bazel's report, and <u>Benecke</u> is inapposite. <u>Benecke</u> held that "[r]equiring remand for further proceedings any time the vocational expert did not answer a hypothetical question addressing the precise limitations established by improperly discredited testimony would contribute to waste and delay and would provide no incentive to the ALJ to fulfill her obligation to develop the record." <u>Benecke</u>, 379 F.3d at 595. In the present case, the ALJ did not "improperly discredit" Dr. Bazel's December 9, 2008 Permanent and Stationary Report. To the contrary, the ALJ identified Dr. Bazel as Plaintiff's treating physician, cited his report repeatedly and at length, compared his treatment notes with Dr. Hoffman's, and specifically cited Dr. Bazel's work restrictions of "no repetitive finger/wrist motion." (AR 34-35, 402). The latter restriction is precisely the recommendation that Plaintiff suggests the ALJ discredited. (MSPC at 3; Plaintiff's Response to Defendant's Memorandum in Support of Answer ("Plaintiff's Response" at 2)). The ALJ found that Dr. Bazel's "no repetitive finger/wrist motion" was consistent with "frequent (not constant) fingering." (AR 35).

Moreover, the ALJ gave due consideration to Dr. Bazel's entire report, which not only recommended that Plaintiff avoid repetitive hand motions but also noted "definite improvement" in her lumbar and upper extremity condition and the "complete

these limitations, with minor variations Plaintiff has not questioned, in her RFC. (AR 32).

1   resolution" of her neuropathy.   (AR 34; <u>see also</u> AR 399-400 (Dr.

2   Bazel's review of January and July 2008 lumbar and upper

3   extremity studies)).   The full record reveals that Dr. Bazel

4   found Plaintiff's condition "dramatically improved" over the

5   course of 2008, leaving her ready to return to "modified duty" at

6   work.   (AR 401).   Crediting his report as true, the ALJ arrived

7   at an appropriate RFC.

8

9   **B.**   **<u>The ALJ Arrived At A Valid RFC Based On The Complete Record,</u>**

10       **<u>And The Vocational Expert Testimony Was Proper</u>**

11

12     The ALJ concluded that Plaintiff had an RFC that included

13   the ability to "frequently handle and finger with both hands."

14   (AR 32).   At the Second Hearing, Plaintiff's counsel devoted

15   considerable time to questioning VE Allan Ey as to the meaning of

16   Dr. Bazel's restriction on "repetitive fingering."   (AR 87-89).

17   Plaintiff's counsel appears to have been concerned that an RFC

18   permitting "frequent" handling and fingering was inconsistent

19   with the "repetitive" hand motions Dr. Bazel counseled Plaintiff

20   to avoid.   However, "frequent" and "repetitive" do not have

21   identical meanings in this context.

22

23     Under Social Security Ruling ("SSR") 83-10, "'[f]requent'

24   means occurring from one-third to two-thirds of the time."   SSR

25   83-10, 1983 WL 31251 (1983).   "Occasionally," by contrast, "means

26   occurring from very little up to one-third of the time."   <u>Id.</u>

27   The same Ruling notes that "[m]any unskilled light jobs are

28   performed primarily in one location, with the ability to stand

being more critical than the ability to walk.  They require use
of arms and hands to grasp and to hold and turn objects, and they
generally do not require use of the fingers for fine activities
to the extent required in much sedentary work," even though
"light" jobs require more standing or walking.  Id.

    The Agency thus routinely uses "frequent" and "occasional"
to describe different physical movements associated with its
categories of "light" and "sedentary" work, but does not employ
the term "repetitive" in the same way.  Courts have generally
concluded that "frequent" and "repetitive" are not synonymous.[23]
See, e.g., Gallegos v. Barnhart, 99 Fed. Appx. 222, 224 (10th
Cir., 2004)("frequent" and "repetitive" are not synonymous, and
ALJ's finding that plaintiff could perform jobs requiring
"frequent" reaching, handling or fingering was not inconsistent
with physician's recommendation against "repetitive" actions);
LeFevers v. Comm'r, 476 Fed. Appx. 608, 611 (6th Cir. 2012)("In
ordinary nomenclature, a prohibition on 'repetitive' lifting does

_____

[23]  The Ninth Circuit has noted that "frequent" and "repetitive"
are not the same.  Gardner v. Astrue, 257 Fed. Appx. 28, 30 n.5
(9th Cir. 2007).   Furthermore, the court found that
"'repetitively' in this context appears to refer to a qualitative
characteristic--i.e., how one uses his hands, or what type of
motion is required—whereas 'constantly' and 'frequently' seem to
describe a quantitative characteristic--i.e., how often one uses
his hands in a certain manner.  Under this reading, a job might
require that an employee use his hands in a repetitive manner
frequently, or it might require him to use his hands in a
repetitive manner constantly."  Id. (emphasis in original).  As
such, the court theorized, "someone who cannot not use his hands
constantly in a repetitive manner, but can use his hands
frequently in a repetitive manner, could perform the jobs of
electronics worker and marker."  Id. (emphasis in original).

not preclude a capacity for 'frequent' lifting," and non-Agency doctor's use of term "repetitive" was not inconsistent with RFC for light work); McCarter v. Colvin, 2014 WL 4908990 (D. Kan., Sept. 30, 2014)("ALJ's hypothetical of frequent handling and fingering with the right hand and no repetitive use by the right hand is not erroneous, as 'no repetitive' use and 'frequent' use are synonymous")(emphasis added).

The Court therefore disagrees with Plaintiff's contention that the ALJ accepted an RFC inconsistent with Dr. Bazel's recommendation against "repetitive" hand motions.  As noted above, the ALJ gave ample consideration to Dr. Bazel's entire assessment, which did not specifically bar "frequent" handling and fingering.  The transcript of the Second Hearing, like the relevant case law, does not show any basis for equating "frequent" and "repetitive" handling and fingering.  At most, the record shows VE Ey agreeing with Plaintiff's suggestion that "frequent" use of the hands -- the standard the ALJ used in her hypotheticals -- might require "intermittent repetitive" hand motions.  (AR 88-89)(emphasis added).  The VE opined that "intermittent repetitive" activity could involve "some breaks, but at times you're doing repetitive types of things."  (AR 88). He offered the example of a telephone order taker whose actions are repetitive while entering data, but not at other times. (Id.).  Plaintiff's counsel then asked the VE to consider a hypothetical employee who was restricted from using "repetitive" (not "intermittent repetitive") hand, finger and wrist motions. (AR 90).  The VE opined that such a person could not do the

33

alternative work that would have been permissible under two of the ALJ's three hypotheticals. (Id.).

Moreover, the ALJ's hypotheticals did not demand that the individual perform "repetitive" hand motions. All three hypotheticals the ALJ posed to Mr. Ey asked him to consider an individual whose work activities required hand motions more limited than those described in Dr. Bazel's restrictions. (AR 84-86). As such, they fell within Dr. Bazel's restrictions. The ALJ twice asked Mr. Ey to describe alternative work for an individual who could do "only frequent handling and fingering with both hands," and added a third hypothetical involving an individual "who could do no more than occasional handling and fingering." (AR 84-86). Mr. Ey opined that an individual capable of "frequent" handling and fingering could find alternative work, but one capable of only "occasional" hand motions could not. (Id.).

In reviewing an ALJ's findings, the court also considers whether her decision is supported by substantial evidence in the record as a whole. Aukland, 257 F.3d at 1035. Here, the ALJ properly considered evidence indicating that Plaintiff's symptoms were not as severe as alleged. (See AR 34). First, she noted Dr. Bazel's finding that Plaintiff's condition had dramatically improved following a full course of conservative treatment, with no surgery. (AR 35). Plaintiff did not avail herself of recommended follow-up treatment that was also conservative, such treatment by an orthopedist. (Id.). Plaintiff did not seek

1    follow-up treatment for CTS from December 2008 until she had a

2    single neurology consultation in November 2011.   (AR 35).

3    "[E]vidence of 'conservative treatment' is sufficient to discount

4    a claimant's testimony regarding severity of an impairment."

5    <u>Parra v. Astrue</u>, 481 F.3d 742, 751 (9th Cir. 2007)(citing

6    <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1434 (9th Cir. 1995)).

7

8        Subjective evidence in the record also supports the ALJ's

9    conclusions regarding Plaintiff's credibility.   Plaintiff told

10   the ALJ that she left her job because she "started having

11   problems with [her] hands."   (AR 76).   However, she told Dr.

12   Bazel that she was fired after struggling to keep up with her

13   work requirements (which may have related to her hand problems),

14   but also because a "new manager . . . came in who had favorites

15   and started to cut back her work hours and give them to [the

16   manager's] 'friends'.".   (AR 388).   Plaintiff avoided taking

17   prescribed pain medications because they made her sleepy, but did

18   not present evidence that she had requested adjustments to her

19   medications that might have addressed these concerns.   (AR 33,

20   63).

21

22       As the ALJ also observed, Plaintiff's testimony as to her

23   daily activities weakened her credibility.   (AR 33).   Plaintiff

24   could prepare breakfast and dinner, "try to pick up light duties

25   around my home," take showers, feed her puppy, and take walks

26   twice a week.   (AR 289).   She was able to do laundry and dishes,

27   make her bed daily, and water her plants.   (AR 291).   The ALJ

28   noted that although Plaintiff had difficulty brushing her hair,

                                   35

"[i]t was noted at the face-to-face application meeting . . .
that [Plaintiff] did not have problems using her hands or
writing." (AR 33). Similarly, the ALJ reasoned that Plaintiff's
"ability to remove weeds, which requires the ability to
grip/grasp and pull, is inconsistent with her statement . . .
that she needs help opening cans and bottles." (Id.). Finally,
although Plaintiff stated in her application that she could only
stand or walk for thirty minutes and sit for an hour, she told
the ALJ that she could "walk longer than sitting," and walked
around the block for exercise. (AR 64).

When assessing a claimant's credibility, the ALJ must engage
in a two-step analysis. Molina v. Astrue, 674 F.3d 1104, 1112
(9th Cir. 2012). First, the ALJ must determine if there is
medical evidence of an impairment that could reasonably produce
the symptoms alleged. (Id.). If such evidence exists, the ALJ
must make specific credibility findings in order to reject the
claimant's testimony. (Id.). The ALJ may consider "(1) ordinary
techniques of credibility evaluation, such as the claimant's
reputation for lying, prior inconsistent statements concerning
the symptoms, and other testimony by the claimant that appears
less than candid; (2) unexplained or inadequately explained
failure to seek treatment or to follow a prescribed course of
treatment; and (3) the claimant's daily activities." Smolen, 80
F.3d at 1284; Tommasetti, 533 F.3d at 1039. As noted above, the
ALJ considered evidence in all of these categories and rendered
specific credibility findings that led her to reject Plaintiff's
testimony.

1      In sum, after giving full weight to Dr. Bazel's entire

2  report, assessing other medical evidence in the record and

3  considering the credibility of Plaintiff's own testimony, the ALJ

4  arrived at hypotheticals that were "accurate, detailed, and

5  supported by the record."  Tackett, 180 F.3d at 1101.  The ALJ

6  took care to solicit opinions from two additional vocational

7  experts when the first VE's testimony proved faulty, and

8  Plaintiff does not suggest that Mr. Ey, the VE at the Second

9  Hearing, made any error in answering the ALJ's valid

10 hypotheticals.  Accordingly, the VE's testimony was proper and

11 remand is not justified on this ground.

12

13                              **VIII.**

14                           **CONCLUSION**

15

16      Consistent with the foregoing, IT IS ORDERED that Judgment

17 be entered AFFIRMING the decision of the Commissioner. The Clerk

18 of the Court shall serve copies of this Order and the Judgment on

19 counsel for both parties.

20

21 DATED:  October 28, 2014          _____/S/_____

22                                   SUZANNE H. SEGAL
                                     UNITED STATES MAGISTRATE JUDGE

23

24                            **NOTICE**

25

26 **THIS DECISION IS NOT INTENDED FOR PUBLICATION IN LEXIS/NEXIS,
   WESTLAW OR ANY OTHER LEGAL DATABASE.**

27

28

                                   37